IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| RED LABEL MUSIC PUBLISHING, INC. et al., | ) ) ) | |
| *Plaintiffs,* | ) ) | No.  18 C 7252 |
| v. | ) ) | Judge Virginia M. Kendall |
| CHILA PRODUCTIONS et al., | ) ) | |
| *Defendants.* | ) ) | |

## MEMORANDUM OPINION AND ORDER

Everybody who grows up in Northern Illinois or is a professional football fan knows the legend of the 1985 Chicago Bears.  After the single loss in their 15–1 season, "da Bears" boldly became the first sports team ever to record a hip-hop song.  Two months later, that team rapped and shuffled their way to an historic 46–10 victory over the New England Patriots in Super Bowl XX.  The *Super Bowl Shuffle* arguably guaranteed that win, and in the process, it captured the hearts and imaginations of many.  Its popularity remains to this day; indeed, it prompted this federal lawsuit.

The song is an original and artistic expression, so it is the creators' (now owners') intellectual property.  The plaintiffs hold the copyrights to the famous record, meaning they determine whether and under what terms others may duplicate it.  They allege the defendants infringed these rights because they produced and distributed a documentary that includes clips of the work without first receiving the

plaintiffs' permission to do so. The defendants argue this was a "fair use" of the material because their film is a historical commentary on the Bears' season and it only uses brief excerpts of the video. Therefore, they maintain they need not pay the plaintiffs to license their work. Because the documentary was a fair use of the music video, the Court enters judgment for the defendants.

## BACKGROUND

Red Label Music Publishing, Inc. owns the copyrights to the words, music, sound recording, and video of the *Super Bowl Shuffle*. (Dkt. 6 ¶¶ 1, 8, 29.) Red Label's agent, Renaissance Marketing Corporation, licenses the use of these rights to others. *Id.* ¶¶ 1, 9, 29. Together, Red Label and Renaissance sued Chila Productions, Richard Lenkov, and Scott Prestin in federal court because they produced *'85: The Greatest Team in Football History*: a film released in 2016 that copied portions of the *Super Bowl Shuffle* without the owner's or agent's permission.[1] *Id.* ¶¶ 2–3, 6, 10–12, 14, 33–34, 36. Red Label and Renaissance assert that these defendants infringed on their intellectual property rights and therefore violated the Copyright Act. *See* 17 U.S.C. §§ 106, 501.

The documentary comments on the *Super Bowl Shuffle*'s role in the season between the 48:50 and 54:01 marks. (Dkt. 47-1.) That portion of the film features eight seconds of the song's music, only four of which contain lyrics. *Id.* *'85: The Greatest Team in Football History* also shows 59 seconds of the *Super Bowl Shuffle*

---

[1] The plaintiffs also sued '85 Bears Documentary, LLC, the film's author, and a number of other entities that distributed, showed, rented, or sold the film without the owner's or agent's consent. (Dkt. 6 ¶¶ 3–5, 13, 15–24, 35.)

music video. *Id.* The producers broke the video up into 16 clips, each lasting between one and eight seconds. *Id.* The audio and video only appear together in one eight-second snippet. *Id.* Otherwise, the clips are on the "B-roll," meaning commentators speak over a silent video as it plays. *Id.*

The defendants moved for judgment on the pleadings (under Federal Rule of Civil Procedure 12(c)), or in the alternative, for summary judgment (under Rule 56). (Dkt. 46.) The plaintiffs moved to strike the plaintiffs' fair use affirmative defenses (Dkt. 107) and opposed summary judgment on the merits. Because the parties presented matters outside the pleadings and the Court did not exclude them, Rule 12(d) required the Court to treat the defendants' motion as one for summary judgment under Rule 56. (Dkt. 113.) The Court gave all parties a reasonable opportunity to present any material pertinent to this motion.[2] *Id.*

## STANDARD OF REVIEW

Summary judgment is proper when "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of

---

[2] Under Federal Rule of Civil Procedure 56(d), the nonmoving party may "submit an affidavit or declaration requesting the court to defer or deny judgment in order to allow for appropriate discovery to address matters raised by the motion. Here, the plaintiffs took an unusual course of action: they responded to the motion *and* filed a declaration under Rule 56(d) . . ." *Spierer v. Rossman*, 798 F.3d 502, 506–07 (7th Cir. 2015) (internal citations omitted) (emphasis in original); Dkt. 114-2 at 2–4. This declaration, then, "did not serve as a motion under Rule 56(d) for additional time to respond to the summary judgment motion," at least the way the plaintiffs composed it. *Id.* at 507. Because the plaintiffs meet the motion on its merits, the Court need not further delay its decision. *See, e.g.*, *RBS Citizens, N.A. v. Sanyou Imp., Inc.*, 525 F. App'x 495, 500–01 (7th Cir. 2013). Alternatively, even if they properly filed their motion, the Court would substantively deny it because it is the *plaintiffs'* information about licensing that is relevant to market harm in this case, not the *defendants'* data about reach and frequency of viewings. *See generally infra* Section II (discussing *Cambridge Univ. Press v. Patton*, 769 F.3d 1232, 1279–80 (11th Cir. 2014)). The plaintiffs' licensing evidence is already in the record (Dkt. 114-1), so the Court has everything it needs to rule.

law." Fed. R. Civ. P. 56(a); *see, e.g., Reed v. Columbia St. Mary's Hosp.*, 915 F.3d 473, 485 (7th Cir. 2019). The parties genuinely dispute a material fact when "'the evidence is such that a reasonable jury could return a verdict for the nonmoving party.'" *Daugherty v. Page*, 906 F.3d 606, 609–10 (7th Cir. 2018) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)). "Rule 56 'mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial.'" *Zander v. Orlich*, 907 F.3d 956, 959 (7th Cir. 2018) (quoting *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986)).

Additionally, a court "may strike from a pleading an insufficient defense or any redundant, immaterial, impertinent, or scandalous matter." Fed. R. Civ. P. 12(f). In so doing, the court exercises considerable discretion. *See Delta Consulting Grp., Inc. v. R. Randle Const., Inc.*, 554 F.3d 1133, 1141 (7th Cir. 2009). Courts generally disfavor motions to strike that serve only to delay but favor those that serve to expedite the case by removing any unnecessary clutter. *See, e.g., Sapia v. Bd. of Educ. of City of Chicago*, No. 14-CV-07946, 2018 WL 1565600, at *4 (N.D. Ill. Mar. 31, 2018) (citing *Heller Fin., Inc. v. Midwhey Powder Co.*, 883 F.2d 1286, 1294 (7th Cir. 1989)).

Courts will strike pleadings that are insufficient as a matter of law, "meaning they bear no relation to the controversy or would prejudice the movant." *Gress v. Reg'l Transportation Auth.*, No. 17-CV-8067, 2018 WL 3869962, at *5 (N.D. Ill. Aug. 15, 2018) (citations omitted). The moving party bears the burden of showing the

"challenged allegations are so remote to the plaintiff's claim that they lack merit . . ." *See, e.g.*, *id.* (citation omitted). Should the request for relief be unrecoverable as a matter of law, the court will strike it. *See, e.g.*, *Fed. Deposit Ins. Corp. for Valley Bank v. Crowe Horwath LLP*, No. 17 CV 04384, 2018 WL 1508485, at *2 (N.D. Ill. Mar. 27, 2018).

## ANALYSIS

Before turning to the defendants' motion for summary judgment based on fair use, the Court addresses the plaintiffs' motion to strike that affirmative defense, seeing that if the Court does so then that will necessarily moot the defendants' motion.

## I.   Motion to Strike

The first issue is whether the plaintiff's motion was even timely. Rule 12(f)(2) empowers parties to move to strike "either before responding to the pleading or, if a response is not allowed, within 21 days after being served with the pleading." Fed. R. Civ. P. 12(f)(2). Here, four defendants answered the amended complaint on February 4, 2019 (Dkt. 45, 51), one defendant answered February 19, 2019 (Dkt. 77), and five other defendants answered on March 6, 2019 (Dkt. 96, 98–101). The plaintiffs then moved to strike the fair use affirmative defenses the defendants asserted in their answers on March 8, 2019. (Dkt. 107.) Because the defendants did not counterclaim, the plaintiffs had no other opportunity to respond to the answers, leaving them with 21 days—or until March 27, 2019—to move to strike. *See* Fed. R. Civ. P. 12(a)(3), (7). The motion was therefore timely as to the five defendants who answered on March 6

and the one defendant who answered on February 19. But the answer is less clear as to the four defendants who answered on February 4.

The plaintiffs cite *Fed. Deposit Ins. Corp. v. Giannoulias*, No. 12 C 1665, 2014 WL 3376892, at *1 (N.D. Ill. July 10, 2014), for the proposition that courts consider timeliness based on the last answer filed in multi-defendant cases with different answer dates. That case, not binding on this Court anyway, stands for no such proposition. There, the court merely exercised its discretion under Rule 12(f)(1) to strike material from a pleading on its own motion. *See id.* Rule 12(f)(1) does not impose any time constraint on courts like it does on parties in Rule 12(f)(2), so courts read that omission to mean they may consider a motion to strike at any point in a case. *See Williams v. Jader Fuel Co.*, 944 F.2d 1388, 1399–400 (7th Cir. 1991) (recognizing this practice but leaving its propriety unaddressed before jumping to the merits); *see also, e.g.*, *Mussat v. IQVIA Inc.*, No. 17 C 8841, 2018 WL 5311903, at *3 (N.D. Ill. Oct. 26, 2018) (Kendall, J.).

The Court also rejects the plaintiffs' framing of their motion to strike as a cross-motion—constituting part of their response to the defendants' motion for judgment on the pleadings or, in the alternative, for summary judgment—approved for filing on March 8, 2019. That claim has no basis in federal civil procedure. If the plaintiffs truly cross-moved, they would have filed their own motion for judgment on the pleadings, or in the alternative, for summary judgment. They did not. They moved to strike under Rule 12(f), not for judgment on the pleadings under Rule 12(c) nor for summary judgment under Rule 56. Those are two very different procedural devices

that request different judicial relief. Because their motion to strike was independent, the deadline in Rule 12(f) applies.

Additionally, the plaintiffs rely on *Doe v. Freeburg Cmty. Consol. Sch. Dist. No. 70*, No. 10-CV-458-JPG, 2012 WL 4006333, at *1 (S.D. Ill. Sept. 12, 2012), to claim that they can move for judgment on the pleadings after the 21-day period under Rule 12(f). True enough, Rule 12(c) imposes its own deadline, which is "[a]fter the pleadings are closed—but early enough not to delay trial . . ." Fed. R. Civ. P. 12(c). As stated previously, however, the plaintiffs did not move under Rule 12(c); they moved under Rule 12(f), so its period governs here. What is more, Rule 12(h)(2)(B) does not permit a party to move to strike an affirmative defense after the Rule 12(f) deadline. It merely clarifies that a party may raise the "failure . . . to state a legal defense to a claim . . . by a motion under Rule 12(c)." Fed. R. Civ. P. 12(h)(2)(B). The Court accordingly denies the plaintiffs' motion to strike as to the four defendants who answered on February 4 as untimely.

Even if the motion was timely, the foregoing discussion reflects the problem with the plaintiffs' motion: it seeks a merits disposition on the defendants' fair use defenses, making it inappropriate for resolution on a motion to strike under Rule 12(f). Instead, the proper path to take would have been for the plaintiffs to move under Rule 12(c), or in the alternative, under Rule 56, like the defendants did and as the plaintiffs seemingly now concede they effectively did. That the plaintiffs think their case against fair use is so strong is entirely beside the point. That is not a reason

to strike an affirmative defense. The Rule says that a court may only strike an "insufficient defense," not a defense that is colorable yet ultimately a loser on the merits.

As a general matter, fair use is not an insufficient defense in a copyright infringement case. Often, it *is* the copyright infringement case. *Cf. Atkins v. Pickard*, 298 F. App'x 512, 513 (7th Cir. 2008) (stating that Rule 12(f) is not a good fit for qualified immunity, a comparable affirmative defense). For that reason, fair use is neither irrelevant to this case nor so remote from the plaintiffs' claim that it lacks merit. *See, e.g., Gress*, 2018 WL 3869962 at *5 (internal citations omitted). The plaintiffs' motion to strike, then, has served only to delay this litigation, precisely the reason courts generally disfavor motions of this stripe. *See, e.g., Sapia*, 2018 WL 1565600 at *4 (internal citation omitted). The plaintiffs added unnecessary briefing when all the Court needed was their response in opposition to the defendants' motion for judgment on the pleadings, or, a real cross-motion. *See Custom Vehicles, Inc. v. Forest River, Inc.*, 464 F.3d 725, 727 (7th Cir. 2006) (criticizing a similar type of appellate motion practice).

To be sure, the question of what qualifies as an insufficient defense within the meaning of the Rule remains a bit of an open one in this Circuit. *See, e.g., Maui Jim, Inc. v. SmartBuy Guru Enterprises*, No. 1:16 CV 9788, 2019 WL 2076366, at *3 (N.D. Ill. May 10, 2019) (Aspen, J.) (following "the majority view of district court decisions in this circuit, which apply the pleading standard set forth in *Twombly*, 550 U.S. 544, 127 S. Ct. 1955, and *Iqbal*, 556 U.S. 662, 129 S. Ct. 1937, to affirmative defenses."); *Grayson v. Cellco P'ship*, No. 18 CV 06124, 2019 WL 1858469, at *3 n.2 (N.D. Ill. Apr.

25, 2019) (Gottschall, J.) (acknowledging the split amongst courts in this District). This Court, admittedly, has implicitly followed this trend without expressly passing on the issue. *See Intercon Sols., Inc. v. Basel Action Network*, 969 F. Supp. 2d 1026, 1064 (N.D. Ill. 2013) (Kendall, J.), *aff'd*, 791 F.3d 729 (7th Cir. 2015).

Fair enough, an affirmative defense comprising bare bones conclusory allegations, to use the terminology, is likely sufficient to strike the defense. But the inquiry is whether it is *necessary* to strike the defense as it is necessary to dismiss a claim. On the one hand, Rule 8(a)(2) calls for "a short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2). On the other hand, Rule 8(b)(1)(A) requires a party to "state in short and plain terms its defenses to each claim asserted against it." *Id.* at 8(b)(1)(A). Indeed, "[e]ach allegation must be simple, concise, and direct." *Id.* at 8(d)(1). Perhaps, then, the *Twombly-Iqbal* framework should apply, considering the nearly matching text.

So says the Second Circuit. Just this year, it noted the divide amongst courts and commentators, then "conclude[d] that the plausibility standard of *Twombly* applies to determining the sufficiency of all pleadings, including the pleading of an affirmative defense, but with recognition that, as the Supreme Court explained in *Iqbal*, applying the plausibility standard to any pleading is a 'context-specific' task." *GEOMC Co. v. Calmare Therapeutics Inc.*, 918 F.3d 92, 98 (2d Cir. 2019). Expanding on its holding, the court distinguished the "key" context of pleading an affirmative defensive in an answer from a claim in a complaint. *Id.* Because the defendant (or counter-defendant) has significantly less time to "gather facts necessary to satisfy the

plausibility standard," courts should apply a lesser "degree of rigor . . . for testing the pleading of an affirmative defense." *Id.*

In addition, the nature of the affirmative defense matters because the "the facts needed to plead [it] . . . may not be readily known to the defendant, a circumstance warranting a relaxed application of the plausibility standard." *Id.* In that case, the example the court used was an ultra vires defense, where the defendant needs more information to plead how an act was done without the requisite legal authority. *See id.* In this case, the affirmative defense is fair use, which in a lot of ways also demands detail about a defendant's ability to use another's copyrighted material. As the Court will lay out below, many facts regarding marketplace harm (e.g. loss of licensing revenue) are within the peculiar control of the plaintiffs here.

The Second Circuit's approach is persuasive, and the Court follows its lead. *Twombly* and *Iqbal* provide a helpful frame of reference for the affirmative defense analysis; however, courts should remain cognizant of the specific context within which these issues often arise and therefore typically give defendants some slack in pleading them. Applying this standard here, the defendants' fair use defense is plausible. Although not a model pleading by any stretch of the imagination, the defendants alleged facts that enable the Court to draw the reasonable inference that they are not liable for the misconduct alleged. Consequently, timely or not, the Court substantively denies the plaintiffs' motion to strike.[3] Still, the Court appreciates their

---

[3] Assuming *Twombly* does not apply to affirmative defenses, the Court would still deny the plaintiffs' motion to strike for the reasons stated in this opinion. The plaintiffs are—and have been—on notice of the defendants' fair use argument.

arguments and takes them seriously, and at this point moves on to the merits to discuss them in their proper place.

## II.    Fair Use

Fair use is a statutory defense to a claim of copyright infringement. *See Kienitz v. Sconnie Nation LLC*, 766 F.3d 756, 758 (7th Cir. 2014).  The Copyright Act sets out four, non-exclusive factors that a court must consider in determining whether a specific use of a protected work is fair: "(1) the purpose and character of the use . . .; (2) the nature of the copyrighted work; (3) the amount and substantiality of the portion used in relation to the copyrighted work as a whole; and (4) the effect of the use upon the potential market for or value of the copyrighted work." 17 U.S.C. § 107; *see Brownmark Films, LLC v. Comedy Partners*, 682 F.3d 687, 692–93 (7th Cir. 2012).  The Court takes each factor in turn.

### A.    Purpose and Character of the Use

The first fair use factor concerns "the purpose and character of the use, including whether such use is of a commercial nature or is for nonprofit educational purposes."  17 U.S.C. § 107(1).  § 107's preamble lists examples of fair uses, such as: "criticism, comment, news reporting, teaching . . . scholarship, or research." *Id.* § 107. These examples "guide[ ]" the analysis under the first factor.  *Campbell v. Acuff-Rose Music, Inc.*, 510 U.S. 569, 578 (1994).  "Central to determining the purpose and character of a work is whether the new work merely supersedes the original work, or instead adds something new with a further purpose or of a different character." *Brownmark Films, LLC*, 682 F.3d at 693 (citing *Campbell*, 510 U.S. at 579).

Here, *'85: The Greatest Team in Football History* is a biographical documentary about the 1985 Chicago Bears, one of the most famous and successful teams in NFL history. Over the course of approximately 100 minutes, the film reviews the span of the entire season through the eyes of former players, coaches, and fans. (Dkt. 47-1.) For around five of those minutes—indeed, halfway through the documentary—it comments on the *Super Bowl Shuffle*. *Id.*

The players recorded the song to entertain their fans and raise money for those in need. *Id.* Metaphorically, though, it was the turning point in the season, coming after the team's only loss and paving the way to its eventual Super Bowl victory. The players interviewed for the film discuss how they regained their confidence and reasserted their dominance in the league after the *Shuffle* came out. *Id.* To many, the song embodies the team's unique camaraderie among its many divergent personalities.

It follows, then, that the purpose and character of the documentary is to comment on the sport-social phenomenon that was the 1985 Chicago Bears. This kind of historical commentary that documentary filmmakers often produce adds something new to a music video that was originally intended to entertain and raise money. *See* § 107 (preamble); *Campbell*, 510 U.S. at 579. The use of *Super Bowl Shuffle* clips in the film thus differs from the work's original purpose. As in *Bouchat v. Baltimore Ravens Ltd. P'ship*, "the video[ ] in this case is intended to present a narrative about some aspect of [Bears] or NFL history." 737 F.3d 932, 939–41 (4th Cir. 2013), *as amended* (Jan. 14, 2014).

The film uses snippets of the *Super Bowl Shuffle* "as part of the historical record to tell stories of past drafts, major events in [Bears] history, and player careers." *Id.* at 940 (citing in part *Bill Graham Archives v. Dorling Kindersley Ltd.*, 448 F.3d 605, 609–10 (2d Cir.2006) ("finding that Grateful Dead posters reproduced in a biographical text served as 'historical artifacts' that helped readers to understand the text")). The filmmakers, then, used the *Super Bowl Shuffle* "'not for its expressive content, but rather for its factual content . . .'" *Id.* (internal citations omitted).

Reinforcing this finding, the portions of the protected video and audio are—in large part—not present in the documentary. The filmmakers used the song for eight seconds in the 100-minute documentary, only four of which contain lyrics. *'85: The Greatest Team in Football History* does not utilize any of the famous players' individual verses in the song, nor does it play the chorus in its entirety. As a matter of fact, the song's title, the *Super Bowl Shuffle*, never appears in the relevant clips. The video portions, for whatever they are worth, comprise 59 seconds total. The producers broke them up into 16 separate clips that last between one and eight seconds, only one of which includes music.

The *Super Bowl Shuffle* is not serving its original function of entertainment in the film. In fact, "[i]t serves [almost] no expressive function at all, but instead acts simply as a historical guidepost . . . within a video[ ] that construct[s] new narratives about the history of the [Bears] and the NFL." *Id.* (citing in part *Elvis Presley Enters., Inc. v. Passport Video*, 349 F.3d 622, 629 (9th Cir. 2003) ("noting the transformative nature of using copyrighted works as historical context"), *overruled on other grounds*

*by Flexible Lifeline Sys., Inc. v. Precision Lift, Inc.*, 654 F.3d 989, 995 (9th Cir. 2011) (per curiam)).

It is *'85: The Greatest Team in Football History* that now serves an expressive function. *See id.* (citing *Bill Graham Archives*, 448 F.3d at 611 ("posters reproduced in a biographical work were 'inadequate to offer more than a glimpse of their expressive value'"). The *Super Bowl Shuffle*, used insignificantly, no longer serves "the same intrinsic purpose as the original . . ." *Am. Geophysical Union v. Texaco Inc.*, 60 F.3d 913, 923 (2d Cir. 1994). Instead, the defendants used it for its "factual content to tell new historical narratives about the players and franchise." *Bouchat*, 737 F.3d at 941 (internal citation omitted).

It is no answer that the defendants produced the documentary for commercial gain. This really only comes up when the alleged infringement substitutes for the copyrighted work in the market. *See Campbell*, 510 U.S. at 591. When the defendant does not merely duplicate and copy verbatim the original in its entirety, pecuniary gain is largely a non-issue. *See id.* Also, because the music video clips appear sparingly, they do not themselves provide commercial gain to the defendant filmmakers. *See Bouchat*, 737 F.3d at 942 (quoting *Elvis Presley Enters., Inc.*, 349 F.3d at 627 (explaining that "the degree to which the new user exploits the copyright for commercial gain—as opposed to incidental use as part of a commercial enterprise—affects the weight" given to commerciality)). The use of the *Super Bowl Shuffle* was "incidental to the larger commercial enterprise of creating [a] historical video[ ] for profit.

Although the [record] was part of a product created for commercial gain, its role in facilitating that gain was unquestionably minimal." *Id.*

The first factor weighs in favor of fair use because the *Shuffle*'s presence in the film is "purely descriptive and designed merely to preserve a specific aspect of [Bears] history." *Id.* at 947 (citing in part *Elvis Presley Enters., Inc.*, 349 F.3d at 629 ("noting, in the context of an Elvis documentary, that defendant's 'use of many of the television clips is transformative because they are cited as historical reference points'")); *see Authors Guild v. Google, Inc.*, 804 F.3d 202, 226–27 (2d Cir. 2015) (describing how a program's snippet function does not provide users with the expressive content of the book because its purpose is to give contextual information).

## B. Nature of the Copyrighted Work

The second factor focuses on "the nature of the copyrighted work." 17 U.S.C. § 107(2). The *Super Bowl Shuffle*'s original, creative, and expressive nature places it within the core of the Copyright Act. "Nonetheless, 'if the disputed use of the copyrighted work is not related to its mode of expression but rather to its historical facts, then the creative nature of the work' matters much less than it otherwise would." *Bouchat*, 737 F.3d at 943 (internal citation omitted). Because *'85: The Greatest Team in Football History* is complementing—not supplanting—the *Super Bowl Shuffle*, the second factor is not all that useful here. Although the original music video is a creative work of art, the filmmakers' use of it lessens the importance of its creativity. The second factor is largely neutral.

## C.    Amount and Substantiality of the Portion Used

The third fair use factor considers the amount taken by the infringers "in rela-

tion to the copyrighted work as a whole."  17 U.S.C. § 107(3).  Courts sometimes ask

whether the secondary use took the "heart" of the original work.  *Harper & Row Pub-*

*lishers, Inc. v. Nation Enterprises*, 471 U.S. 539, 544, 564–65 (1985).  Ultimately, "the

extent of permissible copying varies with the purpose and character of the use."

*Campbell*, 510 U.S. at 586–87.

As previously determined, the filmmakers' use of the *Super Bowl Shuffle*—

heartful or not—was insubstantial.[4]  The documentarians only used eight seconds of

the song's music in the film, and of those eight seconds, only four include the lyrics.

The song itself is nearly six minutes long, so the defendants' use of a fraction of it

(2%) was no more than necessary to serve as a historical reference point in the com-

mentary.  The 16 one-to-eight second video clips, totaling 59 seconds, fare no differ-

ent.  They make up a small portion of the *Shuffle* (17%) and an even smaller portion

of *'85* (1%).  That leads the Court to weigh this factor in favor of fair use.

## D.    Effect of the Use Upon the Potential Market

Finally, that brings the analysis to the fourth factor: market effect.  *See* 17

U.S.C. § 107(4).  It is usually the most important of the four.  *See Kienitz*, 766 F.3d at

758.  Indeed, it is here.  Courts ask "whether the contested use is a complement to

the protected work (allowed) rather than a substitute for it (prohibited)."  *Id.* at 758–

59 (first citing *Ty, Inc. v. Publications International Ltd.*, 292 F.3d 512 (7th Cir. 2002);

---

[4] Many Chicagoans likely remember the *Super Bowl Shuffle* best for the famous players' verses, including Walter Payton's, Jim McMahon's, William Perry's, and Gary Fenick's.

then citing *Chicago Board of Education v. Substance, Inc.*, 354 F.3d 624 (7th Cir. 2003)). A complementary (sometimes called transformative) use renders market substitution less likely and market harm more difficult to infer. *See Campbell*, 510 U.S. at 591.

Still, "[m]arket harm is a matter of degree, and the importance of this factor will vary, not only with the amount of harm, but also with the relative strength of the showing on the other factors." *Id.* at 590 n.21. Courts must "consider not only the extent of market harm caused by the particular actions of the alleged infringer, but also 'whether unrestricted and widespread conduct of the sort engaged in by the defendant . . . would result in a substantially adverse impact on the potential market' for the original." *Id.* at 590 (quoting 3 Nimmer § 13.05[A][4] (1993)).

In this case, the plaintiffs do not argue that *'85: The Greatest Team in Football History* affected the market for full recordings, whether they be audio or audio-visual, of the *Super Bowl Shuffle*. Rightly so, because no one would purchase the right to view *'85* as a substitute for purchasing the *Shuffle*. It is frankly inconceivable that hearing a clip of the song in the documentary would dissuade a listener from purchasing it if she was otherwise predisposed to do so.

That said, "a copyright holder is entitled to demand a royalty for licensing others to use its copyrighted work, and that the impact on potential licensing revenues is a proper subject for consideration in assessing the fourth factor." *Am. Geophysical Union v. Texaco Inc.*, 60 F.3d 913, 929 (2d Cir. 1994) (internal citations omitted). But "not every effect on potential licensing revenues enters the analysis under the fourth

factor. Specifically, courts have recognized limits on the concept of 'potential licensing revenues' by considering only traditional, reasonable, or likely to be developed markets . . ." *Id.* at 929–30 (internal citations omitted).

Although confused in the briefing, the defendants fail to consistently deal with the fact that the 'market' in fair use cases means the *potential* market for not only the original work, but also derivative uses and licensing rights. *See, e.g.*, Thomas Plotkin & Tarae Howell, *"Fair Is Foul and Foul Is Fair:" Have Insurers Loosened the Chokepoint of Copyright and Permitted Fair Use's Breathing Space in Documentary Films?*, 15 Conn. Ins. L.J. 407, 433–34 (2009) ("Even if the first three factors of the test can be satisfied, the fourth factor pre-supposes a licensing market for the copyrighted work which may render any abrogation of permission harmful, and thus not a fair use.").

They would not be alone in doing so. *See Campbell*, 510 U.S. at 590 (failing "to address the effect on the market for rap derivatives and confin[ing] themselves to uncontroverted submissions that there was no likely effect on the market for the original."). Because fair use is an affirmative defense, defendants generally need to "bring forward favorable evidence about relevant markets." *Dr. Seuss Enterprises, L.P. v. Penguin Books USA, Inc.*, 109 F.3d 1394, 1403 (9th Cir. 1997). Maybe the defendants feel like they did in pleading and arguing that the documentary engages in a different market than the song.

The plaintiffs, though, are publishers, so they "can . . . be expected to have the evidence as to availability of licenses for their own works. It is therefore reasonable

to place on the [p]laintiffs the burden of going forward with the evidence on this ques-
tion." *Cambridge Univ. Press v. Patton*, 769 F.3d 1232, 1279 (11th Cir. 2014). Alt-
hough this might effectively create "a presumption that no market for digital permis-
sions exists for a particular work, . . . [t]his is reasonable, because if a license was
available during the relevant time period, [the] [p]laintiffs can rebut the presumption
of no market by going forward with evidence of license availability." *Id.* at 1279–80.
This burden on the plaintiffs "creates no presumption about whether a given instance
of copying will be fair use. This approach merely recognizes that this is a case
wherein one party has all the evidence on a particular issue, and so it is equitable to
require that party to go forward with the evidence." *Id.* at 1280 n.34.

Regarding their evidence, the plaintiffs start by asserting that the defendants
never paid them licensing fees, so they have at least lost that money they are owed.
But "a copyright holder can *always* assert some degree of adverse affect on its poten-
tial licensing revenues as a consequence of the secondary use at issue simply because
the copyright holder has not been paid a fee to permit that particular use." *Am. Ge-
ophysical Union*, 60 F.3d at 930 n.17 (first citing Leval, *Toward a Fair Use Standard*,
at 1124 ("By definition every fair use involves some loss of royalty revenue because
the secondary user has not paid royalties."); then citing Fisher, *Reconstructing Fair
Use*, at 1671 (appreciating that in almost every case "there will be some material
adverse impact on a 'potential market'" because the secondary user did not pay)).

Granted, the potential uses of the *Super Bowl Shuffle* include the selling of
permission to reproduce portions of it in shows or films like the defendants'

documentary. The plaintiffs, for their part, demonstrated that they do license such reproduction, so a licensing market does exist here. It is not determinative, however, that the plaintiffs license excerpts of the *Shuffle*. "In other words, the fact that [the] [p]laintiffs have made paying easier does not automatically dictate a right to payment." *Cambridge Univ. Press*, 769 F.3d at 1276; *see Fox News Network, LLC v. Tveyes*, Inc., 883 F.3d 169, 180 (2d Cir. 2018), *cert. denied*, 139 S. Ct. 595 (2018) (citing *Bill Graham Archives,* 448 F.3d at 615) (stating that a "copyright owner has no right to demand that users take a license unless the use that would be made is one that would otherwise infringe an exclusive right.").

Here, the plaintiffs failed to articulate any tangible way that the defendants' documentary reduced or will reduce the potential licensing market for clips of the *Super Bowl Shuffle*. The documentary's use of the clips is "too few, too short, and too small in relation to the whole" to undercut the market for clips of the *Shuffle. Monster Commc'ns, Inc. v. Turner Broad. Sys., Inc.*, 935 F. Supp. 490, 495 (S.D.N.Y. 1996). Speaking of the market, the critical question is whether the film itself substituted for *Super Bowl Shuffle* clips. *See, e.g.*, *Hofheinz v. A & E Television Networks*, 146 F. Supp. 2d 442, 449 (S.D.N.Y. 2001).

The insignificant reproduction of portions of the *Super Bowl Shuffle* in a documentary serves a different market function than the song does standing alone. The secondary use does not supplant or substitute for the primary. Driving this conclusion is the fact that this case "concerns not the market for [the] [p]laintiffs' original works themselves or for derivative works based upon those works, but rather a

market for licenses to use [the] [p]laintiffs' works in a particular way." *Cambridge Univ. Press*, 769 F.3d at 1277–78. This is an important conceptualization because "licensing poses a particular threat that the fair use analysis will become circular, and [the] [p]laintiffs may not head off a defense of fair use by complaining that every potential licensing opportunity represents a potential market for purposes of the fourth fair use factor." *Id.* at 1278.

Because the evidence shows that there is some market for clips of the *Super Bowl Shuffle*, the value of plaintiffs' copyrights may have suffered a little damage. More to the point, widespread use of similar unlicensed experts could cause substantial harm to the potential market. The problem is that the defendants are not in the business of licensing audio-video clips like the plaintiffs are. The parties operate in significantly different markets. The defendants do not compete with the plaintiffs in any way, shape, or form.

The contrast between a feature-length film and a series of seconds-long snippets could not be starker. It would be a different story if, instead of selling a Chicago Bears documentary, the defendants sold *Super Bowl Shuffle* clips. As a result, if the defendants streamed just the clips over the internet, then they might replace the plaintiffs' clips in the market. For instance, web sites wishing to show portions of the *Super Bowl Shuffle* could choose to enter licensing agreements with the defendants rather than the plaintiffs. On top of that, internet users searching for *Shuffle* clips may be drawn by the defendants' clips to web sites other than the plaintiffs', depriving them of their opportunity to advertise and sell other products to those users. But

nothing like that happened here. *See Video Pipeline, Inc. v. Buena Vista Home Entm't, Inc.*, 342 F.3d 191, 202–03 (3d Cir. 2003), *as amended* (Sept. 19, 2003) (comparing the display of movie trials to that of clip previews); *see also Perfect 10, Inc. v. Amazon.com, Inc.*, 508 F.3d 1146, 1168 (9th Cir. 2007).

The relevant market that fair use concerns itself with is "the market for plaintiffs' 'expression,' and thus it is the effect of [the] defendants' use of that expression on [the] plaintiffs' market that matters, not the effect of [the] defendants' work as a whole." *NXIVM Corp. v. Ross Inst.*, 364 F.3d 471, 482 (2d Cir. 2004) (internal citation omitted). The defendants did not "bring[ ] to the marketplace a competing substitute for the original, or its derivative, so as to deprive the rights holder of significant revenues because of the likelihood that potential purchasers may opt to acquire the copy in preference to the original." *Capitol Records, LLC v. ReDigi Inc.*, 910 F.3d 649, 662 (2d Cir. 2018) (internal citation omitted).

Factor four is necessarily intertwined with factor one, and as stated previously, the potential purchasers of *Super Bowl Shuffle* clips will not purchase the documentary from the defendants instead of the clips themselves from the plaintiffs. *Cf. Elvis Presley Enterprises, Inc. v. Passport Video*, 349 F.3d 622, 631 (9th Cir. 2003) (reasoning that someone in the market for music and still photographs would purchase a documentary film instead of the music or pictures they seek). This factor does not weigh in either party's favor.[5]

---

[5] Even assuming for the sake of argument that factor four weighed in the plaintiffs' favor, it would still be insufficient to overcome the substantial weight of the other factors. *See Bouchat*, 737 F.3d at 949.

\*　　\*　　\*

All told, the first and third factors weigh in favor of fair use, while the second and fourth are neutral at best. Taken together, the defendants' use of *Super Bowl Shuffle* clips in *'85: The Greatest Team in Football History* was a fair use of the plaintiffs' copyrights. Importantly, "a finding of fair use here does not translate to a finding of fair use in each instance where plaintiff's copyrighted works have been infringed. Thus, potential infringers of plaintiff's copyrighted works, to the extent that they exist, are likely to seek a license to avoid . . . litigation." *Hofheinz v. AMC Prods., Inc.*, 147 F. Supp. 2d 127, 140–41 (E.D.N.Y. 2001).

Fair use "protects filmmakers and documentarians from the inevitable chilling effects of allowing an artist too much control over the dissemination of his or her work for historical purposes." *Bouchat*, 737 F.3d at 944. The Fourth Circuit put it best when it stated:

> Were we to require those wishing to produce films and documentaries to receive permission from copyright holders for fleeting factual uses of their works, we would allow those copyright holders to exert enormous influence over new depictions of historical subjects and events. Such a rule would encourage bargaining over the depiction of history by granting copyright holders substantial leverage over select historical facts. It would force those wishing to create videos and documentaries to receive approval and endorsement from their subjects, who could 'simply choose to prohibit unflattering or disfavored depictions.'

*Bouchat*, 737 F.3d at 944 (internal citation omitted). In passing the Copyright Act, Congress never intended to "discourage the makers of all sorts of historical documentaries and displays," or "deplete society's fund of informative speech." *Id.* at 949.

Quite the contrary, its intent was to encourage creation and advance the arts. *See Sony Corp. v. Universal City Studios, Inc.*, 464 U.S. 417, 450 (1984).

## CONCLUSION

At day's end, the defendants' use of the plaintiffs' copyrights was fair. The Court accordingly grants the defendants' motion for summary judgment (Dkt. 46) and denies the plaintiffs' motion to strike (Dkt. 47).

Virginia M. Kendall
United States District Judge

Date: May 30, 2019